**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON BURNS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-5258 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE SHERWIN-WILLIAMS | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Wooden pallets are unsung heroes of the economy. They are modern workhorses for the distribution of just about every consumer product. They facilitate the efficient movement of heavy goods between manufacturers, distributors, and retailers. Good luck trying to buy a consumer product that did not, at some point, hitch a ride on a pallet.

But sometimes pallets can get in the way and pose a danger to the workforce. They aren't tall, but they're wide, and they take up space. Worse yet, they are low to the ground, sitting right about ankle level. They're at the perfect height to trip someone. And for Plaintiff Jason Burns, that's precisely what happened.

Burns delivered a tractor trailer full of paint-related supplies to a Sherwin-Williams store. He pulled up to the back of the store, and began to unload. He used a walkie – a hand-operated electric forklift – to move the pallets. At first, things went smoothly.

But then he took a tumble. He walked backwards out of the garage while using the walkie, down a short ramp. As he backed up, he moved toward a dumpster, and he spotted a few oversized, empty pallets. He tried to stop the walkie, but it was too late. The walkie had

momentum and, like anything heavy, it can't stop on a dime. His foot became lodged between the walkie and the pallets, and then he fell.

Burns filed suit against Sherwin-Williams for his injuries. The complaint offers a number of theories why, in his view, Sherwin-Williams acted negligently. Burns claims that the company failed to exercise ordinary care by leaving pallets in a work area, and by providing an unsafe walkie that was unsuitable for the job. He offered expert testimony to support his claims.

After discovery, Sherwin-Williams moved for summary judgment, and moved to exclude the expert from testifying. For the reasons stated below, the Court grants both motions.

## Background

Jason Burns worked as a truck driver with Cardinal Logistics, a transportation management company. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 104). In 2018, Burns delivered palletized products (*i.e.*, products laying on pallets) to a Sherwin-Williams store in the Chicagoland suburbs. *Id.* at ¶¶ 1–2.

He drove his tractor trailer to the rear of the store, and backed up near the garage door. *Id.* at ¶ 3. He then parked the truck and walked to the back entrance. *Id.* at ¶ 4.

A dumpster sat outside the rear of the store, close to where Burns was working. *Id.* at ¶ 5. A few discarded, oversized pallets lay on the asphalt next to the dumpster. *Id.* The pallets came from a previous delivery. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 19 (Dckt. No. 107).

Burns greeted a Sherwin-Williams employee, Ramiro Bahena, before opening the rear doors of his trailer. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 104). Bahena was the only Sherwin-Williams employee working that day. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 107).

Unloading the truck was a two-person job, using two pieces of equipment:  a pallet jack, and a "walkie" forklift.  At first, maybe you can't envision what they look like, based on the names alone.  Or, maybe you know what they are, but you didn't know what they were called.  If you've ever been in a supermarket or a big-box store, you've seen them.

A pallet jack (also called a pallet truck, or a hand truck) is a simple-looking piece of machinery.  It basically consists of a set of forks, like the forks of a forklift.  A vertical handle stands on one end, with a circular-shaped handle on top.  A worker can simply pull the handle down, and then scoot along with a pallet.  It is basically a stripped-down forklift, without an engine.  It's the kind of thing that a worker might use to lug a pallet of gelato at the grocery store.

A walkie forklift is, as the name suggests, a forklift that an operator walks behind.  Instead of sitting down and driving the machine, the operator of a walkie stands and holds a handlebar with the controls.  From there, the worker can direct the machine forward or backward, left or right.

A walkie forklift is similar to a pallet jack, but it has more heft.  Like a pallet jack, it has a set of forks for moving pallets.  And like a pallet jack, it has a handle on one end.  But a walkie forklift is larger than a pallet jack.  It isn't as big as a full-blown forklift.  But it is a meatier-looking piece of equipment than a pallet jack.

An operator controls a walkie by using the thumb drive.  It is the directional throttle control, and it is located on the handlebars of the walkie.  *Id.* at ¶ 19.  The direction of the thumb drive determines the direction of the walkie.  *Id.*  Flipping the switch forward makes the walkie go forward, and flipping the switch backward makes the walkie go backward.  *Id.*

When a walkie is moving in one direction, an operator can place the thumb drive in the opposite direction to slow down the machine. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 107). For example, if the walkie is moving backward, and the operator moves the thumb drive forward, the walkie will slow to a stop and then start moving forward. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 104); Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 n.1 (Dckt. No. 107).

This procedure is called "plugging." Plugging is a method for stopping the walkie in non-emergency situations. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 104).

Plugging doesn't stop a machine right away. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 107). It slows the machine down until it can move in the opposite direction (*i.e.*, the direction of the thumb drive). *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 104).

Back to the story. Burns and Bahena needed to unload the truck of paint-supply goods. Burns climbed inside the trailer and used a pallet jack to move pallets to the end of the trailer. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 104).

At that point, Burns passed the baton (and the pallets). Bahena used a "walkie" forklift to carry the pallets out of the trailer, and took them inside the store through the garage. *Id.* Burns and Bahena repeated this process a few times. *Id.*

At some point, Bahena had to go inside the store to answer a phone call. *Id.* at ¶ 9. But the job wasn't complete. The two men agreed that Burns would finish unloading while Bahena took the call. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 107).[1]

---

[1] Burns testified that Bahena asked him if he was "good to finish up" the delivery, and Burns responded "yes." *See* Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 104) (citing Burns Dep., at 59:16-20 (Dkct. No. 99-2)). Sherwin-Williams disputes this fact, but it provides no citation to the record. *See* Def.'s Resp. to

Burns climbed down from the trailer and began operating the walkie. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 104); Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 4–6 (Dckt. No. 107). That task fell within his job description. His duties as a truck driver included operating a forklift whenever a store employee was busy or occupied. *See* Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 104).

In fact, Burns had experience with this particular walkie. Burns had used this specific walkie forklift – at this specific Sherwin-Williams store – somewhere between 8 to 18 times in the past. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 107).[2]

Burns got his hands on the walkie, took it to the truck, and used it to unload the last pallet off the trailer. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 104). He lowered the final pallet, resting it next to the dumpster and the discarded oversized pallets. *Id.* Burns was "generally aware of what was around." *Id.* at ¶ 11.

At that point, he decided to get the empty pallets from inside the garage. *Id.* at ¶ 12. To get there, he had to go up a small ramp. *Id.* at ¶ 13. It wasn't the world's largest ramp. It was akin to a mini driveway, a few feet long, with a slight slope. By the look of things, it wasn't that long, and wasn't that high, and wasn't that steep.[3] But it wasn't flat, either. It went downhill, which can pose a challenge when moving things.

---

Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 107). At summary judgment, a flat denial is not enough. Sherwin-Williams did not support its denial with any evidence, so the fact is deemed admitted.

[2] Once again, Sherwin-Williams disputes these facts (*i.e.*, Burns's responsibility to use a forklift and his past use of this walkie forklift) without any explanation – let alone a citation to the record. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 107). So these facts are admitted.

[3] Plaintiff's expert opined that the concrete apron had a downward slope of four degrees. *See* Ferrone Report, at 3 (Dckt. No. 96-4). To put that in perspective, take a look at the opinion. A line of text is about nine inches long, and the space between each line of double-spaced text is about half an inch. It's roughly 9" x 0.5". So, look at two lines of text. Start on the left, and go all the way to the right, and then go up one line. Imagine if a line was drawn between those two points – that is, a line from the far left of the bottom line of text, to the far right of the upper line of text. By the Court's math (with the help of a member of the local math team), the angle is 3.18 degrees. So, the angle of the ramp was only a little more than the angle between two lines of text in a double-spaced document.

To get a sense of the scene, the parties included some photos. The picture below depicts the back of the garage, the ramp, and the dumpster. You can see a man – *not* Burns – operating a walkie. This first photo does not include the oversized pallets on the day of the accident. It simply shows the location of accident. Notice the walkie, the ramp, and the locations of the pallet and the dumpster:



*See* Exhibit 10 Photo (Dckt. No. 104-2, at 37 of 38).

Burns drove the walkie up the ramp, entered the garage, and used the walkie to pick up the empty pallets. *Id.* He then exited the garage. He backed up, so he walked backwards down the ramp. *Id.* That is, he faced the garage, moved in reverse, and headed down the ramp. *Id.*

Burns did not go in a straight line toward the truck. He began reversing toward the dumpster. *Id.* at ¶ 14. He planned to do a two-point turn.[4] In other words, he planned to back up to the dumpster, stop, and then move the walkie forward to his trailer to offload the empty pallets. *Id.* at ¶ 15.

All the while, Burns knew about the oversized pallets resting on the asphalt by the dumpster. He "was aware of the discarded pallets as he approached the dumpster." *Id.* at ¶ 16.

As he backed up, Burns made a "guestimation of how far away that pallet was," meaning the discarded, oversized pallets by the dumpster. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 17 (Dckt. No. 104). As he got closer to the pallets, he slowed the walkie down by pushing the thumb drive forward. *Id.*; *see also id.* at ¶ 21. Again, that's called "plugging." The goal was to stop going backward by telling the walkie to go forward.

Pushing the thumb drive forward did not bring the walkie to a screeching halt. But he noticed that the walkie wasn't stopping fast enough. *Id.* at ¶ 21. So Burns engaged the emergency brake. *Id.*; *see also* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 107).

The walkie stopped, but not in time. The walkie pinched his right foot between the machine and the discarded pallets, injuring his foot and causing him to take a spill onto the pallets. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21 (Dckt. No. 104); Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 107). Unfortunately, he broke his right ankle.

About twenty minutes later, Burns took a picture with his cellphone of the oversized pallets, the dumpster, and the walkie. That picture is below. To get your bearings, he took the photo from the perspective of the garage, facing the truck. The first picture (above) showed the

---

[4] The parties call it a three-point turn, but it seems like a two-point turn. He planned to back up, stop, and then go forward in a different direction.

opposite perspective, facing the store. That's why the dumpster is on the right in the first picture (above) and is on the left in the second picture (below). It's the same dumpster.



*See* Exhibit 9 Photo (Dckt. No. 104-2, at 38 of 38); *see also* Burns Dep., at 65:11 – 68:7 (Dckt. No. 99-2) (describing the photo).

After his fall, Burns brought a workplace injury action against Sherwin-Williams in state court. *See* Cplt. (Dckt. No. 1-1). Sherwin-Williams, in turn, removed the case to federal court. *See* Notice of Removal (Dckt. No. 1).

The complaint is only three pages long, and it does not break the allegations into separate counts. The complaint offers a few theories about the walkie, claiming that Sherwin-Williams failed to properly maintain it, repair it, inspect it, and so on. *See* Cplt., at ¶ 6(a)–(c), 6(h) (Dckt. No. 1-1). Those theories basically allege that the walkie was unsafe. *Id.*

The complaint then makes allegations about the pallets by the dumpster. Burns claims that Sherwin-Williams failed to remove them, and never should have put them there in the first place. *Id.* at ¶ 6(e)–(f).

Burns also alleges that Sherwin-Williams failed to warn him about the dangers posed by the walkie and the pallets, and failed to have plans and policies in place to protect visitors like him. *Id.* at ¶ 6(d), (g), (i)–(k).

Burns supported his claims about the walkie with an expert report from an engineer, Christopher Ferrone. *See* Ferrone Report (Dckt. No. 96-4). He tested the walkie in question, and measured the distance and the time that it takes to stop it. Ferrone opined about the safety and the suitability of the machine.

After discovery, Sherwin-Williams moved for summary judgment on all theories of liability. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 97). The company also moved to exclude the expert under *Daubert*, challenging Ferrone's qualifications and the reliability of his opinions. Part of the motion for summary judgment depends on the viability of the *Daubert* motion. *See* Def.'s Am. Mem., at 6–10 (Dckt. No. 111).[5]

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[5] Sherwin-Williams's original memorandum supporting its motion for summary judgment cited to record exhibits, not its statement of material facts. *See* Def.'s Mem. (Dckt. No. 98). Burns pointed out this mistake in the company's response brief, arguing that Sherwin-Williams thereby violated Local Rule 56.1 by citing to "raw record materials." *See* Pl.'s Resp., at 1–2 (Dckt. No. 102); *see also Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664 (N.D. Ill. 2015) (holding that parties must "cite Local Rule 56.1 statements and responses rather than directly to record materials") (collecting cases). In response, Sherwin-Williams moved for leave to file an amended summary judgment brief, which this Court granted. *See* 5/9/22 Order (Dckt. No. 110). Sherwin-Williams filed that brief, and it includes updated citations to its Local Rule 56.1 statement. *See* Def.'s Am. Mem. (Dckt. No. 111). The Court therefore cites to this updated memorandum through its Opinion.

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Before diving into the analysis, it is helpful to pin down what, exactly, the Court is analyzing. Here, that task poses a bit of a challenge. In broad strokes, the complaint addresses the pallets and the walkie. Beyond that, it gets hazy.

The complaint offers facts and theories, but does not pin down the causes of action. It includes a little wiggle room.

Plaintiff's brief does not lay down stakes on firm ground, either. Burns speaks about his case in terms of theories of liability, not claims. "Plaintiff asserts the following theories of

liability:  (1) Defendant negligently placed discarded *pallets* laying flat in the workplace area, (2) Defendant failed to provide a reasonably safe *walkie* forklift, and/or (3) Defendant provided a *walkie* forklift not suitable for the intended work."  *See* Pl.'s Resp., at 1 (Dckt. No. 102) (emphasis added).

Notice two things about Plaintiff's summary of his case.  First, the first theory is about the pallets, and the other two theories are about the forklift.  Second, it sounds like Plaintiff is advancing negligence claims.  But maybe the complaint reaches premises liability, too (meaning liability based on one's status as the landowner).

Drilling down into the claim(s) about the pallets gets especially tricky.  In its motion, Sherwin-Williams covered its bases by addressing both premises liability and negligence.  *See* Def.'s Mem. (Dckt. No. 98).  "Under Illinois law, premises liability and negligence are distinct torts with distinct elements."  *Price v. Int'l Paper Co.*, 2020 WL 6044288, at *2 (N.D. Ill. 2020); *see also Donald v. Target Corp.*, 2016 WL 397377, at *1 (N.D. Ill. 2016) ("Courts have recognized the independence of these two claims and have highlighted the different elements required to prove each one.") (collecting cases).

In response, Burns hedged.  "Plaintiff Burn[s]'s claims regarding Defendant's placement of the pallets in the loading dock area *primarily* sound in ordinary negligence, not premises liability."  *See* Pl.'s Resp., at 4 (Dckt. No. 102) (emphasis added); *see also id.* at 2 (referring to "Plaintiff's ordinary negligence claims (as opposed to premises liability claims)").

The adverb "primarily" does more than its fair share of the work in that sentence.  By the sound of things, Burns is bringing a negligence claim, but he isn't eliminating the possibility that he is claiming premises liability, too.  It is not on center stage, but maybe it is in the cast of characters.

11

Putting that issue aside, Sherwin-Williams argues that it has no liability for the pallets because they were readily visible. The company devotes much of its brief to the open and obvious doctrine. In its view, the obviousness of the potential hazard defeats any possible claim about the pallets.

To keep thing straight, the Court will proceed as follows. The Court will address the claims about the pallets, and then will address the claims about the walkie.

When discussing the pallet-related claims, the Court will discuss premises liability for the sake of completeness. Then, the Court will address whether the open and obvious doctrine applies. (As an aside, it is not open and obvious to this Court whether there is a premises liability claim.) And then, the Court will turn to the negligence claims.

Next, the Court will discuss the walkie-related claims. Those claims rely heavily on the expert testimony. So, the Court will address whether the expert testimony passes muster under *Daubert*, and if not, whether any part of the walkie-related claims survive.

By way of preview, this Court concludes that the open and obvious doctrine applies, and that Sherwin-Williams had no duty to Burns in light of the visible danger. That conclusion applies to the claims about the pallets, regardless of whether they involve premises liability or negligence. This Court also concludes that the expert opinions about the walkie do not pass muster under the Federal Rules. So the claims about the walkie fail too.

## I.     The Pallets

Plaintiff's first theory is about the pallets. The Court will address premises liability, and then negligence. The key question is whether the open and obvious doctrine applies. Based on the record, the Court concludes that the doctrine applies. The Court concludes that Sherwin-

Williams did not owe a duty in light of the open and obvious danger, so Burns cannot bring a claim about the pallets.

### A. Premises Liability

Under Illinois law, businesses owe their invitees a duty to maintain business premises in a reasonably safe condition.[6]  *See McCarty v. Menard, Inc.*, 927 F.3d 468, 471 (7th Cir. 2019).  Whether a duty exists in a premises liability case "is a question of law to be determined by the court."  *Price*, 2020 WL 6044288, at *3 (quoting *Ward v. KMart Corp.*, 136 Ill. 2d 132, 143 Ill. Dec. 288, 554 N.E.2d 223, 226 (1990)); *see also Dunn v. Menard, Inc.*, 880 F.3d 899, 906 (7th Cir. 2018).

Burns was a business visitor, so he was an invitee on the Sherwin-Williams property.  *See Daniels v. Venta Corp.*, 2022 IL App (2d) 210244, 2022 WL 1115179, at *6 (2022) ("A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.") (quoting Restatement (Second) of Torts § 332(3) (1965)).  The question is whether Sherwin-Williams owed a duty of care to Burns when it placed the oversized pallets by the dumpster.

Four factors come into play when deciding if a duty of care exists for premises liability: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant."  *See Bruns v. City of Centralia*, 2014 IL 116998, 386 Ill. Dec. 765, 21 N.E.3d 684, 689 (2014).

Sherwin-Williams argues that it had no duty in light of the open and obvious doctrine. *See* Def.'s Am. Mem., at 11 (Dckt. No. 111).  That is, the pallets were an open and obvious

---

[6]  The parties take it as a given that Illinois law applies.

hazard to a reasonable person, so Sherwin-Williams didn't owe a duty to Burns to prevent his injury.

The open and obvious doctrine "is not an automatic or *per se* bar to the finding of a legal duty on the part of a defendant." *See Bruns*, 21 N.E.3d at 690. But it speaks to the first two factors of the duty analysis – that is, the reasonable foreseeability of the injury and the likelihood of the injury. *See McCarty*, 927 F.3d at 471. When the doctrine applies, "[t]he open and obvious nature of the condition itself gives caution and therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks." *Id.* (quoting *Bucheleres*, 665 N.E.2d at 832).

The open and obvious doctrine relies on the principle that "persons who own, occupy, or control and maintain land are not ordinarily required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious." *See Bucheleres*, 665 N.E.2d at 832; *see also Ward*, 554 N.E.2d at 230 ("Certainly a condition may be so blatantly obvious and in such position on the defendant's premises that he could not reasonably be expected to anticipate that people will fail to protect themselves from any danger posed by the condition."); *Bruns*, 21 N.E.3d at 690 ("The open and obvious rule is also reflected in section 343A of the Restatement (Second) of Torts, which this court has adopted."). Potential examples include fire, high places, water, sidewalk defects, big holes, power lines, large concrete posts, and so on. *Id.*

The idea is that people can protect themselves from danger that they can see coming. "In other words, the law expects ordinary people to take some care for their own safety." *See Hillsamer v. Walmart, Inc.*, 2022 WL 4079451, at *4 (N.D. Ill. 2022). "In cases involving obvious and common conditions, such as fire, height, and bodies of water, the law generally assumes that persons who encounter these conditions will take care to avoid any danger inherent

14

in such condition." *See Bruns*, 21 N.E.3d at 690 (quoting *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 216 Ill. Dec. 568, 665 N.E.2d 826, 832 (1996)).

A "possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them." *See* Restatement (Second) of Torts § 343A, at 218 (1965). "Obvious" means that "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment." *See* Restatement (Second) of Torts § 343A cmt. b, at 219 (1965).

"In cases where the open and obvious exception applies, traditionally the plaintiff affirmatively performed an action despite the presence of some obvious danger." *Patel v. Home Depot USA, Inc.*, 2020 WL 7027633, at *3 (N.D. Ill. 2020) (collecting cases).

Whether a condition of the property is open and obvious "is an objective inquiry." *Id.* "The question is would a reasonable person with [the plaintiff's] knowledge of the situation appreciate and avoid the hazardous condition?" *Id.* (citing *Dunn*, 880 F.3d at 908). When the facts are undisputed, it is a question of law whether the dangerous condition appears open and obvious. *Id.*

Burns doesn't dispute the open and obvious doctrine head-on. He does not argue that a reasonable person would *not* have appreciated the potential danger and tried to avoid the pallets. That quiet concession seems unavoidable on this record. He acknowledges that he saw the pallets and tried to skirt past them.

Instead, Burns argues that two exceptions to the doctrine apply: the deliberate encounter exception, and the distraction exception.

15

The exceptions acknowledge that sometimes "the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger." *See* Restatement (Second) of Torts § 343A cmt. f, at 220 (1965). Life is complicated, and the exceptions recognize that a one-size-fits-all standard may not fit in every situation across the board.

In general, if an exception applies to the open and obvious doctrine (*i.e.*, the deliberate encounter or distraction exceptions), "the outcome of the duty analysis . . . is reversed." *See Bruns*, 21 N.E.3d at 691. "Whereas operation of the open and obvious rule negatively impacts the foreseeability and likelihood of injury, application of an exception to the rule positively impacts the foreseeability and likelihood of injury." *Id.*

That's a long way of saying that Sherwin-Williams may not be liable if the danger was open and obvious, unless one of two exceptions applies.

### 1. The Deliberate Encounter Exception

The first question is whether the deliberate encounter exception to the open and obvious doctrine applies.

The deliberate encounter exception applies "where the possessor [of land] has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." *See Dunn*, 880 F.3d at 908 (alteration in original) (quoting *Bruns*, 21 N.E.3d at 691); *see also Swearingen v. Momentive Specialty Chems., Inc.*, 662 F.3d 969, 973 (7th Cir. 2011). "The focus with the deliberate-encounter exception is on what the possessor of land anticipates or should

anticipate the entrant will do." *Caselberry v. Home Depot U.S.A., Inc.*, 2019 WL 10894136, at *2 (N.D. Ill. 2019) (citation omitted).

The exception usually applies to cases "involving some economic compulsion, such as when a plaintiff is forced to choose between facing danger and neglecting his duties to an employer." *See Dunn*, 880 F.3d at 909 (cleaned up). In other words, it applies in situations where "workers are compelled to encounter dangerous conditions as part of their employment obligations." *See Gammons v. Crown Castle USA, Inc.*, 2019 WL 1168104, at *3 (N.D. Ill. 2019) (quoting *Lucasey v. Plattner*, 2015 IL App (4th) 140512, 390 Ill. Dec. 393, 28 N.E.3d 1046, 1056 (2015)). Maybe a good example is a mail carrier who has to deliver mail to a house, even though there is a large dog in the front yard, with no safe route to the mailbox. The exception also can apply "if some non-economic factor compels the encounter, such as where the only available route necessarily takes the plaintiff past a dangerous condition." *See Caselberry*, 2019 WL 10894136, at *2 (collecting cases).

Selecting the level of generality when defining the task seems key to the analysis. The question is not whether Burns had an obligation to unload the truck. The question is whether he was under an obligation to unload the truck the way that he did. That is, the question is whether he was obligated to back up with the walkie and go in the direction of the dumpster. There is a difference between heading for danger, and heading for danger because you have no other choice.

If Burns had to go by the dumpster, then he had to head for danger. But if not, then he could have avoided the open and obvious danger by going a different direction. The exception does not apply if he could have done his job *without* encountering the danger.

17

Here, the deliberate encounter exception does not apply because Burns did not face any compulsion to reverse the walkie toward the dumpster. Burns provides no evidence that his only available route was to back up in the direction of the dumpster. He needed to unload, but he did not need to unload in the way that he did.

Burns argues that Sherwin-Williams's garage was small and filled with pallets on the day of his injury. *See* Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 104). He explained that he felt "cramped." *Id.* And he contends that it was "impossible" to turn the walkie around within the garage, requiring him to "exit the warehouse in reverse." *Id.* at ¶ 8.

Fair enough. The Court takes it as a given that he needed to exit the garage backwards. But there's a difference between having to reverse, and having to reverse in a specific direction.

The record includes no support for the notion that Burns had only one way to go. If anything, it does the opposite. Based on the photos, Burns did not have to walk backwards to the right, toward the dumpster and the pallets. He could have done the opposite: walk backwards to the left, away from the pallets. At the very least, there is no support in the record for the notion that Burns had only one way to go.

The existence of a choice – a safe path around the danger – means that the exception does not apply. *See, e.g.*, *Caselberry*, 2019 WL 10894136, at *3 ("[Plaintiff] states that she 'had no other choice but to walk through the walkway' but provides no evidence to support that claim. . . . [Plaintiff] did not need to use this aisle to exit or enter the store, or even to access any flowers. Photographs of the scene reveal that there were many aisles available to [plaintiff] if she wished to avoid the hose."); *Hillsamer*, 2022 WL 4079451, at *4 ("[Plaintiff] says nothing about her need to encounter the obvious risk of a slippery substance in her path. Nothing in the record, including her own testimony, indicates [Plaintiff] had to approach the spill to reach a

18

particular product or pass through the aisle without avoiding it."); *Rosenberg v. Home Depot U.S.A., Inc.*, 2019 WL 670262, at *6 (N.D. Ill. 2019) ("[T]here is no evidence that Plaintiff's chosen route over the [forklift's] forks was the only one available. . . . Plaintiff has not presented any evidence that he could not have (1) walked around the back of the forklift, or (2) walked around the front of the forks."); *Gammons*, 2019 WL 1168104, at *4 (holding that the deliberate encounter exception did not apply because plaintiff "had several choices available to him to climb the tower safely"); *Kleiber v. Freeport Farm & Fleet, Inc.*, 406 Ill. App. 3d 249, 347 Ill. Dec. 437, 942 N.E.2d 640, 649 (2010) ("Assuming . . . that there was no other way to access the topsoil except by crossing the empty pallet, we would still, as a matter of law, have to reject the application of the deliberate-encounter exception in this case. Plaintiff's whole argument on this issue ignores the fact that despite the location of the topsoil, plaintiff had another option available. Plaintiff could have gone into the store and asked for assistance.").

Moreover, there is nothing in the record showing that Burns was in a time crunch or felt pressured by his employer to get the job done right away. *Cf. Grillo v. Yeager Constr.*, 387 Ill. App. 3d 577, 326 Ill. Dec. 1002, 900 N.E.2d 1249, 1268 (2008) (applying the deliberate encounter exception where "plaintiff informed defendant of the dangerous condition where he was working, and defendant had reason to expect that plaintiff would continue working despite the dangerous condition in order to complete his work in a timely manner").

Burns had space and time to chart a safe course. He was not compelled to turn toward the dumpster and the dangerous pallets. He was under no compulsion to do what he did, how he did it. Without any compulsion to reverse in the direction of the dumpster, Burns cannot rely on the deliberate encounter exception. *See Gammons*, 2019 WL 1168104, at *3 ("Crown Castle had no reason to expect that Gammons would opt to abandon safety measures to complete his

19

assignment quickly rather than use the time afforded to him by his employer to perform the job in a safe manner.").

### 2. The Distraction Exception

The second question is whether the distraction exception to the open and obvious doctrine applies.

The distraction exception arises "where the possessor [of land] has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *See Dunn*, 880 F.3d at 909 (alteration in original) (quoting *Bruns*, 21 N.E.3d at 691); *see also Rexroad v. City of Springfield*, 207 Ill. 2d 33, 277 Ill. Dec. 674, 796 N.E.2d 1040, 1046 (2003); Restatement (Second) of Torts § 343A cmt. f, at 220 (1965). The exception "will only apply where evidence exists from which a court can infer that plaintiff was actually distracted." *See Bruns*, 21 N.E.3d at 691.

But "the mere fact of looking elsewhere does not constitute a distraction." *Dunn*, 880 F.3d at 909 (quoting *Bruns*, 21 N.E.3d at 692). "Were we to conclude, as plaintiff does, that simply looking elsewhere constitutes a legal distraction, then the open and obvious rule would be upended and the distraction exception would swallow the rule." *Bruns*, 21 N.E.3d at 690.

By the same token, "self-created distractions" that are "solely within the plaintiff's own creation" do not count, either. *Id.* (quoting *Whittleman v. Olin Corp.*, 358 Ill. App. 3d 813, 295 Ill. Dec. 482, 832 N.E.2d 932, 936 (2005)); *see also Price*, 2020 WL 6044288, at *9 ("[W]here a plaintiff's attention 'is diverted by her own independent acts for which the defendant has no direct responsibility, the distraction exception does not apply.'") (quoting *Sandoval v. City of Chicago*, 357 Ill. App. 3d 1023, 294 Ill. Dec. 310, 830 N.E.2d 722, 729 (2005)).

"At bottom, the analysis is one of reasonableness; the court merely asks whether the defendant 'should reasonably anticipate injury to those entrants on his premises *who are generally exercising care for their own safety, but who may reasonably be distracted*.'" *See Keedi v. Menard, Inc.*, 2021 WL 5759272, at *3 (N.D. Ill. 2021) (emphasis in original) (quoting *Deibert v. Bauer Bros. Constr. Co.*, 566 N.E.2d 239, 243–44 (Ill. 1990)).

Burns argues that he was distracted because he had to focus on the walkie and the empty pallets while he was reversing out of the garage. *See* Pl.'s Resp., at 11 (Dckt. No. 102). According to his brief, Sherwin-Williams should have anticipated the risks to Burns because it was foreseeable that he would be distracted by his operation of the walkie.

The distraction exception does not apply to Burns's accident. For starters, the day of the accident was not the first time that Burns had visited that Sherwin-Williams store. He testified that he had delivered goods to the store 10–20 times. *See* Burns Dep., at 32:10-15, 57:16-18 (Dckt. No. 104-2). And the day of the accident was not the first time that he had noticed debris by the dumpster. Burns testified that he had visited the store before, and that there "has occasionally been other debris and trash" by the dumpster. *See* Burns Dep., at 68:14-15 (Dckt. No. 104-2). So he was well aware of the possible presence of hazards.

On the day of the accident, Burns saw the pallets by the dumpster as he reversed the walkie. It is undisputed that Burns was "aware of the discarded pallets as he approached the dumpster," and that he made a "guestimation of how far away that pallet was" as he reversed the walkie. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 11, 17 (Dckt. No. 104). Burns also testified that he was "[l]ooking everywhere . . . over my shoulder and in front of me, back and forth, as to not hit anything" while reversing. *See* Burns Dep., at 96:15-18 (Dckt. No. 99-2).

The record establishes that Burns was not actually distracted from looking at the pallets as he reversed the walkie. If anything, he had his eyes on the target, and he saw the danger coming. So the distraction exception does not apply. *See Bruns*, 21 N.E.3d at 691; *see also Keedi v. Menard, Inc.*, 2021 WL 5759272, at *2 (N.D. Ill. 2021) ("Illinois courts do not apply the distraction exception in absence of any evidence that the plaintiff was actually distracted.").

And, even if Burns was distracted by the walkie while he reversed, that distraction arose of his own doing. He created the distraction through his operation of the machine, not because of any action by Sherwin-Williams, so the exception does not apply. *See Price*, 2020 WL 6044288, at *9 ("[W]hether the distraction exception applies turns on whether the defendant or plaintiff created the distraction.") (cleaned up).

In sum, the open and obvious doctrine applies, and the two exceptions do not. A reasonable person in his shoes would have appreciated the dangers posed by the pallets. *See McCarty*, 927 F.3d at 471. He appreciated the danger from the pallets – he simply ran into them.

### 3. Duty Analysis

A few steps are still left to go. As already explained, "the existence of an open and obvious danger is not an automatic or *per se* bar to the finding of a legal duty on the part of a defendant." *Dunn*, 880 F.3d at 908 (citation omitted). This Court still needs to engage in a traditional duty analysis.

Taking a step back, recall that four factors come into play when deciding whether there is a duty. The factors include (1) the foreseeability of the injury, (2) the likelihood of the injury, (3) the size of the burden to prevent the injury, and (4) the consequences of requiring defendant to carry that burden. *See Bruns*, 21 N.E.3d at 689.

Here, the foreseeability of harm and the likelihood of injury based on the pallets were slight, "weighing against the imposition of a duty." *See Gammons*, 2019 WL 1168104, at *4; *Bruns*, 21 N.E.3d at 690 ("Where the condition is open and obvious, the foreseeability of harm and the likelihood of injury will be slight, thus weighing against the imposition of a duty."). The danger was so obvious that no one would get hurt. It becomes a bit of a mind-bender – the risk was so big, so great, and so obvious that no one would get near it, so no one would get injured. It's so risky that no one would risk it.

An (admittedly absurd) example illustrates the point. The risks of an attempt to jump over the Grand Canyon are so great and so obvious that no one would attempt it. The risk is so great that, in a round-about way, the risk becomes small. The National Park Service does not have to warn people that they cannot jump across the canyon because no one would actually be fool enough to try it. At some point, the risks are so great that the risks become small.

The last two factors address the costs of preventing the injury. The third factor, the magnitude of the burden, reflects "financial considerations relative to the specific condition at issue." *See Albrecht*, 2022 WL 2356416, at *3 (citing *Gutterman v. Target Corp.*, 242 F. Supp. 3d 695, 703 (N.D. Ill. 2017)). The fourth and final factor, the consequences of placing that burden on a defendant, "reflect broader, systemic concerns." *Id.*

The latter two factors rarely outweigh the first two factors when the open and obvious doctrine applies. Courts regularly hold that a defendant has no duty of care when the doctrine comes into play. *See, e.g.*, *Caselberry*, 2019 WL 10894136, at *3 ("Possessors of land almost never owe a duty to their invitees to protect against open and obvious dangers because the foreseeability and likelihood of injury are so low."); *see also McCarty*, 927 F.3d at 471; *Dunn*, 880 F.3d at 910; *Swearingen*, 662 F.3d at 973; *Albrecht*, 2022 WL 2356416, at *7; *Kim v. Simon*

23

*Prop. Grp., Inc.*, 2022 WL 1266433, at *3 (N.D. Ill. 2022); *Walker v. Menards, Inc.*, 2022 WL 279606, at *7 (N.D. Ill. 2022); *Price*, 2020 WL 6044288, at *9; *Durling v. Menard, Inc.*, 2020 WL 996520, at *4 (N.D. Ill. 2020).

So, Burns has a high hill to climb. He doesn't get very far.

Burns argues that the burden on Sherwin-Williams to clear away the pallets was minimal. *See* Pl.'s Resp., at 6–7 (Dckt. No. 102). But he does not offer much evidence to support that point. He points to testimony about the need for safety, in general. *See* Pl.'s Resp., at 6–7 (Dckt. No. 102); *see also* Pl.'s Statement of Facts, at ¶¶ 13–17 (Dckt. No. 104).

Burns offers testimony by the store manager, Jason Egan, who acknowledged that Sherwin-Williams was responsible for ensuring a safe worksite. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 13–14 (citing Egan Dep. (Dckt. No. 104-5)). That goal applied to the loading dock areas. *Id.* at ¶ 15. And Egan testified that the policy aimed to avoid any debris, obstructions, fall hazards, or trip hazards in the workplace. *Id.* at ¶ 17 (citing Egan Dep., at 74:11-18).

As a preliminary matter, the Sherwin-Williams policy is not enough to establish the duty of care. "Courts have repeatedly rejected the notion that a store's internal policies create a legal duty or new standard of care." *See Albrecht*, 2022 WL 2356416, at *5 (collecting cases); *see also Weaver v. Speedway, LLC*, 28 F.4th 816, 824 (7th Cir. 2022) ("[A]lthough a policy manual may be admissible, it cannot, without more, set the standard for a landowner's duty of ordinary care.").

Even then, testimony about the need for safety in general does not move the ball forward very far. The last two factors focus on the costs of doing better, and the consequences of saddling Sherwin-Williams with that burden. Testimony about the need for safety in general

24

does not explain why it would impose a minimal burden on Sherwin-Williams to clear away the pallets.

The pallets had to go *somewhere*, and putting them next to the dumpster seems the natural choice. And frankly, it's hard to think of a better place. The dumpster area presumably got less foot traffic than the inside of the store (one would hope).

The store had a practice of placing some oversized pallets next to the dumpster. *See* Egan Dep., at 76:9-13 (Dckt. No. 104-5) ("I know that that is an area where we have kept oversized pallets."). Bahena testified that he routinely placed oversized pallets next to the dumpster before throwing them away. *See* Bahena Dep., at 63:20 – 64:3 (Dckt. No. 104-3).

The record does include some testimony that the company typically put the pallets behind the dumpster, meaning on the *other* side of the dumpster from where the accident happened. *See* Bahena Dep., at 63:9 – 66:3 (Dckt. No. 104-3); *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 21, 23 (Dckt. No. 107).

Burns could have made an argument that Sherwin-Williams had a duty to put the pallets on the *other* side of the dumpster. Maybe Burns could have argued that the other side of the dumpster was a better, safer location than the side by the loading dock. Maybe Burns could have argued in his brief that Sherwin-Williams had a duty to put the pallets on the other side of the dumpster, and that the benefits of doing so would outweigh the costs. Taking the pallets to the other side of the dumpster would require only a few extra steps, so in that sense, the costs seem minimal.

But Burns made no argument about where else the pallets could or should go. Burns simply argued that the burden of a safe workplace – as a general matter – was "minimal," without suggesting any alternate location. *See* Pl.'s Resp., at 6–7 (Dckt. No. 102) ("The burden

25

of exercising reasonable care here is negligible. . . . In this respect, the burden here was miniscule."). So any argument about the other side of the dumpster is waived. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The nonmoving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quotation marks omitted).

Even if Burns had made that argument, it is far from clear that it would have gotten him anywhere. It might have added something to his side of the scale, but the argument isn't heavy enough to outweigh the other factors.

Every location comes with potential costs, and maybe there are downsides to putting the pallets on the other side of the dumpster. The store manager (Egan) gave a good reason why the pallets ended up where they did. "The other side of the dumpster is a roadway. This side left you enough room to leave the store. You can load the truck and unload the truck properly and safely." *See* Egan Dep., at 76:9-13 (Dckt. No. 104-5). He did not see a need to move the pallets if they were not in the walkway or entryway of the store. *Id.* at 76:23 – 77:2.

Even if, for the sake of argument, there was a better spot for the pallets, monitoring the disposal of pallets from deliveries would impose costs, too. But "Illinois courts, including [the Seventh Circuit] sitting in diversity, have repeatedly rejected imposing the duty of continuously monitoring safety conditions in premises liability cases." *See McCarty*, 9927 3d at 471; *see also Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 652 (7th Cir. 2014) (collecting cases); *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 605 (7th Cir. 2001) ("[T]he duty of inspection and inspection and clean up does not require continuous patrolling of the aisles; the cost would be

26

disproportionate to the benefit.") (internal citation omitted). Those monitoring costs might be disproportionate for an area with relatively little foot traffic, like the area by a dumpster.

The fact that Burns never asked for help has a bearing on the existence of a duty, too. Burns never asked Bahena for help driving the walkie, spotting hazards, moving obstacles, or any other form of assistance. Courts look to whether the injured party asked for help when deciding whether a property owner breached a duty. *See Dunn*, 880 F.3d at 910 (holding that defendant's purported duty to continuously monitor the warehouse would be particularly onerous because plaintiff "did not request assistance despite recognizing the risk and knowing such an option was available"); *Kleiber*, 942 N.E.2d at 649 (holding that the imposition of a burden on defendant to monitor pallets in front of a store would be unreasonable "where the plaintiff never sought assistance from anyone in the store, despite having recognized the open and obvious danger"). In fact, Burns agreed that Bahena could take the call, and that Burns could go solo.

In sum, the Court concludes that the four factors weigh against imposing a duty on Sherwin-Williams. The open and obvious doctrine applies because the pallets posed a visible danger. So the first two factors, the foreseeability and likelihood of injury, weigh against the existence of a duty. The final two factors, the magnitude of the burden and the consequences of placing that burden on Sherwin-Williams, weigh against a duty, too. Even if Sherwin Williams could have put the pallets on the other side of the dumpster, without creating other problems or imposing significant monitoring costs, the possibility of another location is not enough to outweigh the other factors.

The simple reality is that the pallets were out in the open, for all the world to see, and they weren't hard to spot. Burns spotted them – he just couldn't get out of the way in time. On

27

this record, Sherwin-Williams did not have a duty to do anything else to prevent an obvious

danger posed by the pallets.

Without a duty, Sherwin-Williams cannot commit a breach. The Court grants summary

judgment to the company on any premises liability claim.

### B.    Negligence

To prevail on an ordinary negligence claim under Illinois law, a plaintiff "must prove

that: (1) the defendant owed a duty of reasonable care to the plaintiff; (2) the defendant breached

that duty; and (3) the breach proximately caused the plaintiff's injury." *Hickey v. Target Corp.*,

2014 WL 1308350, at *3 (N.D. Ill. 2014).

"These are elements, not factors." *Keedi*, 2021 WL 5759272, at *2. That is, Burns needs

to prove all three components of his negligence claim at trial. And to survive summary

judgment, Burns must establish a genuine dispute of material fact about at least one element. *See*

*id.* ("[T]o succeed on a motion for summary judgment, [defendant] need only show that [the

plaintiff] cannot prevail on any one of the elements."); *Domantas v. Menard, Inc.*, 2022 WL

204374, at *3 (N.D. Ill. 2022).

In response, Burns argues that the open and obvious doctrine applies only to premises

liability claims, and does not apply to negligence claims. *See* Pl.'s Resp., at 2 (Dckt. No. 102).

So, as he sees it, the negligence claims necessarily survive.

Burns is mistaken. The open and obvious doctrine applies to both types of claims. *See*

*Bruns*, 21 N.E.3d at 687, 689–90. Defendants are "entitled to raise the open-and-obvious rule to

either an ordinary-negligence claim or a premises-liability claim." *See Kun Mook Lee v. Young*

*Rok Lee*, 2019 IL App (2d) 180923, 440 Ill. Dec. 1, 149 N.E.3d 551, 557 (2019); *see also Hutson*

*v. Pate*, 2022 IL App (4th) 210696, 2022 WL 2751689, at *6 (2022) ("[T]he doctrine may apply

in both premises liability and ordinary negligence cases . . . .") (collecting cases). And, more recently, at least one federal court in this District has applied the open and obvious doctrine to both an ordinary negligence claim and a premise-liability claim. *See Albrecht ex rel. N.S.S. v. Dick's Sporting Goods, Inc.*, 2022 WL 2356416, at *3 n.1 (N.D. Ill. 2022) (applying the open and obvious doctrine while observing that the plaintiff "appears to assert both negligence and premises liability claims in the Complaint").

Applying the open and obvious doctrine to negligence claims is a relatively recent development in Illinois law. *See, e.g.*, *Hutson v. Pate*, 2022 IL App (4th) 210696, 2022 WL 2751689, at *6 (2022) (collecting cases). That may explain why some older federal cases went the other way. *See, e.g.*, *Smith v. MHI Injection Molding Mach., Inc.*, 2014 WL 1516592, at *4 n.7 (N.D. Ill. 2014) ("[T]hose cases dealt with the open and obvious hazard doctrine, and no Illinois court has extended that doctrine to cover ordinary negligence claims."); *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 511 (7th Cir. 2009) ("We are not aware of any Illinois court that has applied the open and obvious doctrine outside of the premises or product liability arenas to a situation where, as here, a plaintiff knowingly encounters a condition located on the personal property of a third-party that was created by a defendant.").

Accordingly, following Illinois law, this Court applies the open and obvious doctrine to the negligence claims. The same reasoning applies. The pallets posed an open and obvious danger, and the exceptions do not apply. The remaining elements of the duty analysis do not outweigh the open and obvious nature of the oversized pallets.

As a result, Sherwin-Williams did not have a duty of care when it came to the oversized pallets, so there was no breach. The Court grants Sherwin-Williams's motion for summary judgment on the negligence claims about the pallets.

29

## II.    The Walkie Forklift

The claims about the pallets do not pass muster.  The final question is whether the claims about the walkie can survive summary judgment.

Burns claims that Sherwin-Williams failed to provide a reasonably safe walkie, and that the walkie was not suitable for the work.  So, the issues are safety and suitability.  To support each theory, Burns relies on the opinions of his expert, Christopher Ferrone.  He opined that the walkie was unsafe because of a "braking defect," and that the walkie was "not suitable" for unloading the truck.[7]  *See* Ferrone Report, at 10 (Dckt. No. 96-4).

Sherwin-Williams moved to exclude Ferrone's opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* Daubert Motion (Dckt. No. 96).  According to Sherwin-Williams, if the *Daubert* motion is successful, then the Court should grant summary judgment on the two remaining theories of liability.  *See* Def.'s Am. Mem., at 7–10 (Dckt. No. 111).  In other words, the company argues that Burns needs expert testimony to prove that the walkie was unsafe or unsuitable.  And if the expert testimony is inadmissible, then Burns cannot carry his burden of proof.

---

[7]  Burns also submits Ferrone's expert opinion that Sherwin-Williams failed to keep its dock area in a reasonably safe condition because it allowed oversized, discarded pallets to lay in the work area.  *See* Pl.'s Daubert Resp., at 11 (Dckt. No. 103); Ferrone Report, at 10 (Dckt. No. 96-4).  His opinion is irrelevant given the Court's holding that the open and obvious doctrine applies.  A court's holding that a hazard is open and obvious, as a matter of law, precludes an expert opinion on the dangerousness of that hazard. *See Allen ex rel. Linder v. Martinez*, 348 Ill. App. 3d 310, 284 Ill. Dec. 241, 809 N.E.2d 807, 810 (2004) ("[P]laintiffs here submitted a purported expert's opinion that the danger from jumping on a trampoline is not open and obvious to a typical child of 11.  However, under *Sollami*, McPherson's opinion – even if well supported – is irrelevant because, in essence, it is an answer to a question of law that *Sollami* gives our courts the prerogative to decide."); *see also Sollami v. Eaton*, 201 Ill. 2d 1, 265 Ill. Dec. 177, 772 N.E.2d 215, 224 (2002) (holding that the dangers of jumping on a trampoline are open and obvious). This Court concluded that the pallets were an open and obvious danger, and that no exception applies to the open and obvious doctrine.  So any purported expert opinion on the safety conditions of the loading dock are beside the point.  Moreover, Ferrone's expert testimony would not assist the jury – the dangerousness of the pallets are a matter of common sense. *See Schultz v. Walmart, Inc.*, 2022 WL 715458, at *6 (N.D. Ill. 2022).  It doesn't take scientific, technical, or other specialized knowledge to see the obvious hazard of pallets lying next to a dumpster.

In response, Burns does not take issue with the notion that the Ferrone report is the linchpin of his case about the walkie. *See* Pl.'s Resp., at 14–15 (Dckt. No. 102). That is, Burns does not argue that his claims about the walkie can survive without his expert.

The Court agrees with that framing of the issues. Sherwin-Williams believes that the claims about the walkie cannot survive without expert testimony, and Burns does not deny it. Everyone agrees that the claims about the walkie depend on expert testimony. So the Court begins with the *Daubert* motion.

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011).

The Supreme Court enlisted district court judges to stand guard over the jury and protect them from unreliable experts in *Daubert*. *See Kirk v. Clark Equip. Co.*, 991 F.3d 865, 877 (7th Cir. 2021) ("The purpose of *Daubert* . . . was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury.") (cleaned up) (quoting *United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009)); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) ("The district court is the gatekeeper of expert testimony."). The district court must "act as a vigorous gatekeeper to ensure the reliability of expert testimony." *Robinson v. Davol, Inc.*, 913 F.3d 690, 696 (7th Cir. 2019) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

In the end, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *Textron*, 807 F.3d at 834 (cleaned up). "This is due to the fact that '[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778–79 (7th Cir. 2017) (alteration in original) (quoting *Daubert*, 509 U.S. at 595).

"In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 779 (cleaned up). District judges possess considerable discretion in dealing with expert testimony. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997).

Sherwin-Williams argues that Ferrone is unqualified to opine about the walkie, and that his opinions are unreliable. The Court will address Ferrone's qualifications, and then the substance of his opinions.

## A. Qualifications

The first question is whether Ferrone has the qualifications as an expert to say what he said. He does.

An expert must be qualified "by knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll*, 896 F.2d at 212. Courts "consider

a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Trs. of the Chicago Painters & Decorators Pension v. Royal Int'l Drywall & Decorating*, 493 F.3d 782, 788 (7th Cir. 2007).

Ferrone has sufficient qualifications to offer expert testimony about the walkie. He has a bachelor's degree in engineering mechanics. *See* Ferrone CV, at 1 (Dckt. No. 49 of 598). After college, he spent a little over three years working as a mechanic for buses and heavy trucks, and as a mechanical engineer for an architectural firm. *Id.* at 8. He then spent the next 32 years at two different engineering consulting firms (assuming he still works at his firm). *Id.* at 7.

Ferrone's work at the consulting firms consisted of "three or four main things." *See* Ferrone Dep., at 11:14-15 (Dckt. No. 103-2, at 3 of 598). He did "design work," meaning "[s]omebody says they need something designed or they want help with design, so I do that function and we call it design work." *Id.* at 11:15-19. He also carried out "failure analysis, which is involved in litigation most frequently." *Id.* at 11:20-21. And he performed "testing and reconstruction-type of work," with some dabbling in "technical writing." *Id.* at 11:21-23.

Ferrone's practical experience with machinery, particularly with failure analysis and forklifts, passes the qualifications hurdle. He explained that he has extensive experience in "machinery and how all machinery works." *Id.* at 27:21-24. He has "investigated all kinds of forklift and walkie incidents," and was trained to operate forklifts (but not walkie forklifts) in 2004. *Id.* at 21:1-3, 25:13-18. That work history qualifies him to opine about the walkie.[8] *See*

---

[8] This Court is mindful that another court in this district excluded Ferrone as unqualified. *See Couture v. Haworth, Inc.*, 2020 WL 70931 (N.D. Ill. 2020). That case involved defective furniture, and was far afield from Ferrone's qualifications. *Id.* at *7 ("Not every case requires an expert with specialized expertise in the exact subject at issue. But the present case involves product liability allegations related to a specific product in a particular industry, and Ferrone's report and testimony, which vaguely and

*United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017) ("Training and experience are proper foundations for expert testimony."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.").

Maybe Sherwin-Williams could poke holes in his qualifications. But the holes aren't big enough to prevent him from reaching the jury. The hole-poking could wait for cross examination.

### B.    Opinions

An expert, even if supremely qualified, does not have open season to say whatever he or she wants. The opinions must satisfy the reliability standards of the Federal Rules.

"The non-exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94). The test of reliability is "flexible," and *Daubert*'s list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation marks omitted). "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted).

An expert must show that "his conclusions were the fruit of a rigorous, objectively-verifiable approach – something more than mere speculation." *See Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019). "[E]ven a 'supremely qualified expert

---

generally refers to his qualifications, do not show that his expertise extends to office chair safety standards and testing.").

34

cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Id.* (quoting *Smith*, 215 F.3d at 718).

The punchline is that Ferrone's report does not meet the reliability standards of the Federal Rules. But before explaining why, the Court needs to set the table, and explain what Ferrone purported to do. It doesn't exactly jump off the page.

Ferrone's report spans 11 pages. That page count includes two and a half pages listing the materials reviewed, and four and a half pages summarizing deposition testimony. *See* Ferrone Report, at 1–3, 5–9 (Dckt. No. 96-4). That's 7 of the 11 pages. Other pages summarized parts of the record.

In a nutshell, Ferrone tested the stopping ability of the walkie involved in the accident. He performed 12 different tests. He measured how much time, and how much distance, it took to stop the machine.

As a general matter, the report's description of the tests is thin, if not skeletal. There's no meat on the bone. The summary spans less than a page. The report does not say much, if anything, about how he performed the tests. The report is cryptic, offering little explanation about his methodology.

To make matters worse, the introductory sentences described only the last test (#12), without telling the reader what Ferrone was talking about. And worse yet, some of the sentences contained mistakes, which Ferrone acknowledged at deposition. So, attempting to get the story by reading only the report is a bit of a challenge – it is terse, incomplete, and sometimes mistaken, even by Ferrone's own admission.

Ferrone described his methodology at deposition, and the testimony helps to fill in the gaps. Basically, Ferrone "put the walkie through 12 groups of tests – each consisting of one or

more 'runs' where Mr. Ferrone and his assistant would operate the walkie under various circumstances and then attempt to stop it either by applying the brake or by plugging and Ferrone would measure the distance [and time] it took the walkie to stop." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 29 (Dckt. No. 104).

The report begins with a confounding passage: "Four reverse, downhill, tests were conducted using the forward plugging method for braking. Two of the four attempts to stop the machine, did not stop the machine properly." *See* Ferrone Report, at 3 (Dckt. No. 96-4). That summary makes it sound like he performed "four" tests.

On its face, that terse description was more than a little confusing. It described "four attempts," but the next page summarizes 12 tests, not 4 tests. *Id.* at 4. At deposition, Ferrone clarified that that passage was referring only to *test 12*. That is, he performed four attempts – four "runs" – when doing test 12. *See* Ferrone Dep., at 84:16 – 85:9 (Dckt. No. 96-2, at 40 of 58). So, that passage was not describing the first 11 tests at all.

Ferrone acknowledged at deposition that that passage contained "poor semantics on my part" for another reason. *Id.* at 84:23-24. The machine did, in fact, stop. He simply meant that, in his view, the machine did not stop within a safe distance. *Id.* at 84:19 – 85:4.

Putting that misdirection aside, the report simply lists the results of the 12 tests. By the look of things, the first eight tests involved stopping the walkie using the emergency brake (not plugging), indoors. Tests nine and ten involved stopping the walkie using plugging (not the emergency brake), indoors.

The last two tests attempted to reconstruct the accident, on location at the Sherwin-Williams store. Test 11 involved using the emergency brake, outside. Test 12 involved stopping the walkie by plugging, outside.

36

Four tests (#1, 2, 7, 8) involved the braking *distance* (*i.e.*, the distance that it took to stop). *Id.* Four other tests (#3, 4, 5, 6) involved the braking *time* (*i.e.*, the time that it took to stop) (*i.e.*, the time that it took to stop). *Id.* They varied by speed, and by direction (forward or backward). So, the tests involved going (1) forward at normal speed; (2) backward at normal speed; (3) forward at max speed; and (4) backward at max speed. *Id.* The report listed the stopping distances and times for each test.

Each test had a few different runs, meaning that Ferrone performed each test a few different times. The report lists the results for each run. For example, the first test involved a measurement of the braking distance when driving the machine forward, at maximum speed, with no load. He did three runs. The first time, it took 4.46 seconds to stop. The second time, it took 4.76 seconds, and the third time, it took 4.49 seconds. *Id.*

As another example, the third test involved a measurement of the braking time when driving the machine forward, at maximum speed, with no load. He did three runs. The first time, it took 17 inches to stop. The second time, it took 19 inches, and the third time, it once again took 17 inches. *Id.*

The ninth and tenth tests involved plugging, at normal speed with no load. When going backwards (#9), the stopping distance was 12 inches, then 12 inches, and then 15 inches (by run, respectively). *Id.* When going forward (#10), the stopping distance was 14 inches, then 25 inches, then 28 inches, and then 44 inches (by run, respectively). *Id.*

The description of the final two tests (#11, 12) is especially cryptic. They say "downhill (accident scenario), e-brake stops machine quickly," and "downhill (accident scenario), plugging does <u>not</u> stop machine every time (see video)." *Id.* (emphasis in original).

Notice that the report did not include any braking distances in the descriptions of those two tests. So, the report itself did not reveal the stopping distances for tests 11 or 12. Also, at deposition, Ferrone conceded that the last sentence was wrong (again). The machine did, in fact, stop – even though the report declared that the machine didn't stop at all. "That was horribly worded. It does eventually stop it. . . . That was very bad wording on my part. So I will grant you that it did stop." *See* Ferrone Dep., at 83:23 – 84:3 (Dckt. No. 96-2).

With those test results in hand, Ferrone jumped to a dozen conclusions. He opined that Sherwin-Williams failed to maintain the braking system, failed to maintain the machine in a reasonably safe condition, and failed to inspect the equipment, among other things. He opined about proximate causation, too. Half of his opinions end with the same line (or something similar): "This was proximate to causing Mr. Burns' accident and injury." *See* Ferrone Report, at 10–11 (Dckt. No. 96-4).

Many of Ferrone's dozen opinions simply summarized the facts of the case as a whole, without linking them to his testing of the walkie. Examples include: (1) Sherwin-Williams "failed to warn Mr. Burns" about the walkie; (2) Sherwin-Williams "failed to keep their property clear of debris, garbage and/or clutter," and if the empty pallets had not been there, "there would have been more space for Mr. Burns' foot/ankle;" (3) the pallets were placed at the scene "prior to the arrival of Mr. Burns at this location;" (4) Sherwin-Williams "created the hazard," and Burns had nothing to do with it; (5) the pallets "existed exclusively at the properly [sic] controlled/operated by Sherwin Williams;" (6) Sherwin-Williams "posted no warnings" about

38

the property; and (7) Sherwin Williams "failed to keep this loading dock free from debris," and had "exclusive control over the building."[9]  *Id.*

Those "opinions" aren't really opinions.  They do not rest on any methodology or expertise, and they have no link to Ferrone's tests of the walkie.  Ferrone simply summarized his understanding of the facts.

An expert can rely on facts to support his or her opinions.  Facts are building blocks, and summarizing the record is fair game if the point is to support opinions.  An expert can talk about the facts, but an expert can't talk about the facts just to talk about the facts.  An expert needs to link them to opinions.

An expert cannot simply spout facts and dress them up *as* opinions.  An expert witness is not a fact witness, and an expert witness is not a mouthpiece for telling the jury facts by calling them "opinions."  An expert may testify "in the form of an opinion," offering "specialized knowledge" based on scientific "principles and methods."  *See* Fed. R. Evid. 702; *see also Downing v. Abbott Lab'ys*, 2022 WL 4129304, at *10 (7th Cir. 2022) ("[A] proposed expert must bridge the analytical gap by showing a rational connection between the data and the expert's contested conclusion.") (cleaned up); *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 2017 WL 2178504, at *6 (N.D. Ill. 2017) ("The Court agrees with Plaintiff that many of [the expert's] proffered opinions merely parrot what Defendants have told him about disputed

---

[9] Ferrone also opined, in conclusory fashion, about the safety of the workplace.  The opinion spans two sentences:  "Warehouse Safety is based on many aspects, one of which is 'housekeeping.'  Debris must be removed continuously throughout the work shift to maintain safety throughout the facility."  *See* Ferrone Report, at 11 (Dckt. No. 96-4).  He supported those sentences with a long footnote and a longer string cite with citations to publications about workplace safety.  Maybe Ferrone could have testified about industry standards for the cleanliness of workplaces, including the need to remove obstacles.  But that testimony is no longer germane given this Court's ruling granting summary judgment about the pallets.  The two sentences in Ferrone's report do not change the result.

facts or offer opinions that state legal conclusions. . . . [A]n opinion witness cannot simply vouch for the testimony of a fact witness.").

The "opinions" about facts that have no link to the testing of the machine do not pass muster. The jury does not need to hear from Ferrone how the pallets got there, or who was responsible for the job site, and so on. Those opinions are not the product of any methodology, except a regurgitation of the record.

With that overview, the table is now set for the Court to discuss the substance of the opinions. The remaining opinions fall into two broad categories. Ferrone opines that the walkie was unsafe, and that it was unsuitable for the job.

### 1. Opinions about Safety

Ferrone opined that the "brakes failed to slow/stop the machine on the day of the accident." *See* Ferrone Report, at 11 (Dckt. No. 96-4). He rested that opinion on the tests that he performed on the walkie involved in the accident. *Id.*

Again, Ferrone performed 12 tests on the machine, and many of them involved multiple runs each. *See* Ferrone Dep., at 58:20 – 59:4 (Dckt. No. 96-2). The first 8 tests involved the brake system. Tests 9 and 10 involved plugging. Tests 11 and 12 involved something that he called "accident scenario."

In each test, Ferrone had his assistant drive the walkie – forward or backward – before engaging the brakes or "plugging" (again, plugging is the method of placing the thumb drive in the opposite direction of the walkie's movement to slow down the machine). Ferrone then measured the time or distance that it took the walkie to stop. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 29 (Dckt. No. 104).

40

Based on the data, Ferrone opined that the walkie "was not safe." *Id.* But before long, that conclusion runs into serious problems.

Ferrone readily acknowledged that the vast majority of the tests showed no defect. In the first 9 tests, the machine stopped within 68 inches, the standard set in the manual (when using the braking system). *See* Ferrone Report, at 4 (Dckt. No. 96-4); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 30, 32 (Dckt. No. 104). In fact, Ferrone admitted at deposition that the first nine tests revealed no problems:

> Q:     Right. Maybe a better question is was any defect or problem with the machine revealed via Test No. 1?
>
> A:     I don't think so.
>
> *     *     *
>
> Q:     Was any defect or problem with the machine shown via Test 2?
>
> A:     No.
>
> *     *     *
>
> Q:     And was any defect or deficiency in the walkie revealed via Test No. 3?
>
> A:     Didn't seem to be.
>
> *     *     *
>
> Q:     Was any defect or problem with the machine revealed via Test No. 4?
>
> A:     Didn't seem to be.
>
> Q:     Test No. 5 is the same as Test No. 3 except we're going in reverse, correct?
>
> A:     I agree.
>
> Q:     And it was three runs, right?
>
> A:     Yes.

41

Q:      And was any defect or problem with the machine detected or revealed by Test No. 5?

A:      I don't think so, no.

                    *          *          *

Q:      Did Test 6 reveal any defect or problem with the walkie?

A:      No.

                    *          *          *

Q:      Tests No. 7 and 8 did not reveal any problem or defect with the walkie, true?

A:      True.

                    *          *          *

Q:      Did Test No. 9 reveal any defect or problem with the machine?

A:      No.

*See* Ferrone Dep., at 60:10-13, 60:22-24, 62:9-11, 62:19 – 63:4, 64:5-7, 65:7-9, 67:9-11 (Dckt. No. 96-2).  If the reader thinks that the final three tests turned things around, and that Ferrone established some type of defect, the reader has another think coming.

Test 10 (like test 9) involved plugging.  Recall that Ferrone measured the stopping distance when driving the unloaded machine forward, at normal walking speed.  *Id.* at 65:18 – 67:11.  His assistant brought the machine to a stop by moving the thumb control in the opposite direction.

Test 10 involved four runs, and he measured stopping distances of 14 inches, 25 inches, 28 inches, and 44 inches, respectively.  *See* Ferrone Report, at 4 (Dckt. No. 96-4).  Ferrone opined that the latter three stopping distances were "significantly more than what I anticipated." *See* Ferrone Dep., at 68:1 (Dckt. No. 96-2).

On that basis, Ferrone opined that the walkie was unsafe. Maybe Ferrone expected a shorter distance, but his expectation is not enough to set a standard for safety.

Measuring the stopping distance is one thing. Declaring that distance unsafe is another. The actual stopping distance is descriptive, and the "safe" stopping distance is normative. A stopping distance is not safe or unsafe unless there is some standard for safety. That is, there must be something to compare it to.

Ferrone admitted at deposition that there is no industry standard for the stopping distance for a walkie. *See* Ferrone Dep., at 69:19-24 (Dckt. No. 96-2). There is nothing in the report, or in his deposition, about an industry standard. In fact, the parties agree that no industry standard exists: "There is no published guidance or standard for how quickly a walkie is supposed to stop when the operator attempts to stop it by plugging." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 104); *see also* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 31 (Dckt. No. 107).

The only standard appears in the walkie's maintenance manual, titled "Parking Brake System." The manual sets a standard for stopping the machine when using the parking brake, not when plugging. The manual states that the "[t]ruck at full speed with rated load must stop in its own length." *See* Maintenance Manual, at 148 (Dckt. No. 103-2, at 311 of 598); *see also* Ferrone Dep., at 63:5-11.

The walkie is approximately 68 inches long. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 31 (Dckt. No. 107). So, when using the *brake*, the machine needs stop within 68 inches.

There is no industry standard for the stopping distance when *plugging*. And there is nothing in the manual about that issue, either. Ferrone testified:

> Q:    There is no set distance within which the walkie should stop when
>        traveling forward at a walking speed with no load via plugging, true?

> A:     I would agree.  There are not – I looked high and low in all the manuals, and there is no such parameter as you've described the test.  *There is no plugging parameters for stopping.*

*See* Ferrone Dep., at 68:14-20 (Dckt. No. 96-2) (emphasis added).  And again:

> Q:     The 68 inches on page 147 [of the manual] is the only stopping parameter that we have from any source?
>
> A:     It appears that way.  I think the engineer from Fusion confirms that.  I confirm it, and *I haven't seen anything else and I actually put a lot of effort into looking into that.*

*Id.* at 69:19-24 (emphasis added).

Ferrone admitted that, in test 10 (forward plugging), the machine stopped in a shorter distance than the standard in the manual (for braking, anyway).  *See* Ferrone Dep., at 70:1-5.  It stopped in 14 inches, 25 inches, 28 inches, and 44 inches, respectively.  That's less than 68 inches, four times in a row.

Ferrone couldn't point to any industry standard, or anything in the manual, that required the walkie to stop at a distance less than 68 inches when plugging.  He testified:

> Q:     Are you aware of any publication or guidance anywhere that says a 44-inch or a 28-inch forward stop distance for plugging this walkie is unsafe or too long?
>
> A:     I looked.  *I couldn't find any.*

*See* Ferrone Dep., at 76:5-9 (emphasis added).  He simply declared that 28 inches and 44 inches was "unsafe."  *See* Ferrone Dep., at 73:7 – 75:15 (Dckt. No. 96-2).

The methodology for tests 11 and 12 differed from the methodology for the other 10 tests.  *Id.* at 86:17 – 90:17.  The methodologies differed in location (inside vs. outside), slope (flat vs. incline), and way of measuring (actual measurement vs. estimation).

The first 10 tests took place inside, on a flat surface. The first 10 tests involved driving the machine until reaching a piece of tape on the floor. At that point, the operator stopped the machine, and Ferrone measured the distance and the time.

Tests 11 and 12 took place on the site of the accident. It was outside, on a sloped surface. The operator didn't run the machine until he reached a piece of tape. Instead, Ferrone's assistant drove the walkie, and then stopped it by using the break (#11) or by plugging (#12). Ferrone didn't take measurements on site. He took videos. *Id.* at 81:6-21, 102:19 – 103:2.

Test 11 involved using the emergency brake, not plugging. *See* Ferrone Dep., at 77:16 – 78:23. Once again, the machine showed no defect. It "stops quickly," at a distance of only 17 inches. *Id.* at 79:16 – 80:19. The machine passed test 11 with flying colors:

> Q: Did Test No. 11 reveal any defect or problem with the machine?
>
> A: In that operational scenario, it seems that the emergency brake functions correctly.

*See* Ferrone Dep., at 79:20-23. In test 11, the machine performed so well that Ferrone didn't bother to measure the stopping distance. *Id.* at 92:4-9.

Test 12 involved plugging. *See* Ferrone Dep., at 79:24 – 80:16. That final test involved four runs. *Id.* at 81:3-5; *but see id.* at 80:17-19 (answering that test 12 involved three runs, before correcting himself later).

Ferrone admitted that the machine stopped properly in two of the four runs on test 12. *Id.* at 86:4-6 ("No disrespect, but why would you say that? It's two. Two of the four [runs in test 12] didn't stop it properly. Two times it stopped much shorter than the 60 to 64, and then two of them it was 60 to 64."); *id.* at 96:18-24. For those two runs, the walkie stopped so quickly that he didn't do any measurements. *Id.* at 90:18 – 92:3.

But in his view, test 12 showed a "very extended plugging distance" in the other two runs. *Id.* at 82:2-8. Later, Ferrone estimated that the stopping distance for those two runs was between 60–64 inches. *Id.* at 82:9-20; *id.* at 85:1-2 ("[I]t should have said it stops within 60 to 64 inches."). "There's variance. I'm saying if you took a rough average, it's going to be in the low 60s. 60, 64 inches. We don't have to fight over 2 or 3 inches." *Id.* at 83:1-4; *id.* at 86:15-16 ("Well, the two that I'm concerned with are 60 to 64 inches."); *id.* at 88:14-15 ("[I]t turns out to be about 64 inches."); *id.* at 93:13 ("[Runs] 2 and 3 are approximately 64 inches.").

"Estimated" is the right verb. Ferrone did not stop the machine on site, get out a tape measure, and measure the distance. Instead, he took videos for test 12. *Id.* at 81:6-21. At the time, Ferrone was concerned that the tests were unsafe, because the dumpster was still sitting there. *Id.* at 86:17 – 93:22. He didn't want the recreation of the accident to cause a new accident.

So, he decided to stop the tests, and he hoped to get back to the site after Sherwin-Williams moved the dumpster. *Id.* He wanted to do more tests. *Id.*

That follow-up testing never happened. *Id.* Ferrone was stuck with the videos, without actual measurements. *Id.* So, he took a close look at the videos, and used a 3D scan of the property to approximate the distance. *Id.* at 87:8 – 88:15, 89:14 – 93:22, 103:17 – 104:8. He estimated that the machine stopped within 64 inches, or maybe a little less, every time:

> Q: And it stopped it every time within about 64 inches?
>
> A: True.

*Id.* at 84:13-15; *id.* at 104:14-16 ("I think I said earlier, they're all somewhere between 60 and 64 inches. There's some variance, but they're approximately that.").

46

That estimate provided the foundation for his conclusion that the machine did not stop properly. In his view, the fact that the machine needed 60–64 inches to stop meant that the machine was unsafe:

> Q:    The basis for your opinion that plugging does not stop the machine quickly enough in tests – excuse me – runs, 2, 3, and 4, of Test No. 12 is what?

> A:    The plugging distance, the overall plugging distance of 60 to 64 inches.

*Id.* at 98:10-15.

Notice that number:  64 inches.  That's less than 68 inches – the standard in the manual, *the only standard out there*.  Ferrone admitted that the walkie's actual stopping distance was less than the stopping distance in the manual:

> Q:    Similarly to the Test No. 10, in each of the runs you did in Test No. 12, the machine stopped within the parameters for braking distance in the machine's user's manual, true?

> A:    The numbers that I got from my testing are numerically less than the number on page 147 of the user's manual, yes.

> Q:    And that parameter in the user's manual is the only published stopping distance for this machine that anybody can find or is aware of?

> A:    It's what the Fusion engineer [retained by Defendant, apparently] and myself believe is the only number that's published.

*Id.* at 96:6-17.

Ferrone believed that the machine should have stopped sooner.  The manual contemplated a stopping distance of 68 inches for a fully loaded machine, and here, the machine was not loaded.  *See* Ferrone Dep., at 98:16 – 99:7 (Dckt. No. 111-7).[10]  "That parameter [in the

---

[10]  Defendant filed selected pages of the deposition transcript, and Plaintiff submitted the full version (in minuscript).  *See* Ferrone Dep. (Dckt. No. 96-2); Ferrone Dep. (Dckt. No. 111-7).  Filing selected pages has its virtues, but it has potential downsides, too.  The Court appreciates the inclination to remove unnecessary girth from the docket, an inclination that few lawyers share.  Still, chopping off pages can leave the reader hanging.  You never know when you will hook the reader, who wants to see the next

manual] is at full speed, fully loaded. Full speed, fully loaded, 68 inches. This [test] is about half of the speed, no load, and it's nearly the same distance. That doesn't make any sense. It should stop considerably shorter at half the speed and no load." *Id.* at 99:2-7.

That answer raised a natural follow-up question. If the stopping distance should be less, how much less? That is, if 64 inches is an unsafe stopping distance, what is the right stopping distance?

Ferrone had no answer. He couldn't point to anything suggesting that 64 inches was too long. He couldn't point to anything saying what the right number should be. And worse yet, he had not even considered the question:

> Q:     My question is what, in your opinion, would be an acceptable stopping distance for the runs you did in Test No. 12?
>
> A:     Well, considerably less than that.
>
> Q:     Are you able to testify as to a number?
>
> A:     Well, the longer – let me sort of back into it. The longer the stopping distance, the more trouble an operator is going to have with his safety or the people around him. So obviously we want the number to be as numerically small as the machine can do under those circumstances. On a flat surface, it's doing 12 to 15 inches of stopping distance. The incline is going to add some to that, but I don't think it triples it or quadruples it. . . .
>
> Q:     Right. Can you testify as to a number, a number of inches within which the walkie, in your opinion, should stop on the four runs in Test No. 12?
>
> A:     Well, like I said, it should be considerably shorter than the number that I'm reporting to you. I would say – *I haven't really considered it since you asked this question. I don't know. Maybe on the order of – I really don't know. I really don't know. I haven't considered that.*

---

page. And here, as things go, this deposition transcript was a bit of a page turner (no kidding). And this Court wanted to keep reading. But Defendant stopped at page 98. *See* Ferrone Dep., at 98 (Dckt. No. 96-2, at 53 of 58). The next page of the ECF filing was page 112 of the deposition transcript. *See* Ferrone Dep., at 112 (Dckt. No. 96-2, at 54 of 58). There was good stuff – substantively important testimony – on pages 99 and following. So, the Court flipped to the version filed by Plaintiff. That's why the citation here shifted to a different version of the transcript.

*Id.* at 99:14 – 100:23 (emphasis added).

To summarize, there are three key takeaways.

First, Ferrone performed 12 tests on the walkie.  Ferrone admitted that the machine performed properly in 10 of the 12 tests (tests 1–9, and 11).  In his view, only tests 10 and 12 were problematic.

Second, for the two problematic tests, the machine performed within the guidelines in the manual.  That is, every time, the machine had a stopping distance of less than 68 inches.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 104).

Third, Ferrone believed that a stopping distance of 60–64 inches was too long.  But he couldn't point to any standard anywhere – not an industry standard, not a standard in the manual, not anything – saying that 64 inches is too long.  And he didn't know what the right stopping distance should be.

Ferrone's opinions about the safety of the machine do not pass the reliability standards under the Federal Rules.  An expert's opinion must rest on something, above and beyond the expert's say-so.  "[E]xperts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (quoting *Joiner*, 522 U.S. at 146).

District courts must bar from the gate an expert who offers speculation and subjective beliefs, not opinions backed by scientific methodologies.  *See Daubert*, 509 U.S. at 590 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."); *Joiner*, 522 U.S. at 146; *Textron*, 807 F.3d at 837 ("When a district court concludes that there is simply too great an analytical gap between the data and opinion proffered such that the opinion amounts

to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony.") (cleaned up).

Conclusory statements don't cut it, either. An expert "cannot simply assert a 'bottom line.'" *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). "As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Zenith Elec.*, 395 F.3d at 419 (citations omitted); *see also id.* at 420 ("Reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert."). "Because I said so" isn't a great argument, except in the parenting context.

Ferrone's off-the-cuff, back-of-the-envelope, armchair-quarterback assertion that 64 inches seems unsafe lacks any scientific rigor. To see why, it's useful to look back at the reliability standards for an expert. *See Daubert*, 509 U.S. at 593–94. His declaration that a stopping distance of 64 inches is unsafe cannot be tested (or, at the very least, no one has proposed a way to test it). It was not subjected to peer review. It's hard to know what the error rate is when someone picks an arbitrary line in the sand. And 64 inches is not generally accepted in the industry.

Ferrone doesn't know where the line is. But he believes that 64 inches is on the wrong side of the line. That conclusion was not the "fruit of a rigorous, objectively-verifiable approach – something more than mere speculation." *See Timm*, 932 F.3d at 994.

Ferrone's proclamation of unsafety was not the product of "some recognized scientific method." *Id.* It feels more like something drawn up on the back of a napkin, in a pinch. Or worse. It looks more like spit-balling than scientific investigation. It's a standardless standard, resting on nothing.

50

Ferrone's opinions about the safety of the walkie do not pass muster under the Federal Rules. The Court grants the *Daubert* motion and excludes the testimony that the walkie was unsafe.[11]

### 2.    Opinions about Suitability

Burns also offered Ferrone to support the notion that the walkie was not suitable for the job. Once again, there is nothing there.

Ferrone's report says almost nothing about suitability. The only reference appears on the second to last page, in the list of "Opinions/Conclusions." *See* Ferrone Report, at 10 (Dckt. No. 96-4). It reads in full: "Sherwin Williams provided a pallet jack to Mr. Burns that was not safe, which was out of maintenance and not suitable for this task. This was proximate to causing Mr. Burns'[s] accident and injury." *Id.*

That's it. The reader searches in vain for anything in the preceding 10 pages of the report about suitability. Ferrone offered a raw conclusion. An expert cannot pass through the gate carrying raw conclusions.

At deposition, Ferrone attempted to expand the scope of his opinions. He testified that the "machine is not supposed to be used on a ramp." *See* Ferrone Dep., at 133:8-12 (Dckt. No. 111-7); *see also id.* at 179:1-7. Later, he added that, according to the manual, the walkie should not be used outside. *Id.* at 165:17 – 166:14, 169:24 – 171:5, 179:1-17; *see also* Ferrone Dep., at

---

[11] Ferrone had a few other opinions about the machine, such as the belief that Sherwin-Williams did not inspect it or maintain it properly. *See, e.g.*, Ferrone Dep., at 118:23 – 124:23 (Dckt. No. 111-7); Ferrone Report, at 10 (Dckt. No. 96-4). But those opinions fall by the wayside, given the lack of any evidence that the machine was unsafe. By Ferrone's own admission, the machine stopped within 64 inches. A failure to inspect a safe machine isn't much of a problem, and couldn't proximately cause an injury. Also, at deposition, Ferrone could not point to any part of the machine that was broken or not working, and could not identify any maintenance that would have fixed any (unknown) mechanical problem. *See, e.g.*, Ferrone Dep., at 117:23 – 124:5. And in any event, Ferrone offered no analysis in his report about the inspection or maintenance history of the machine, and no analysis about proximate causation (raw conclusions don't count).

133:8-12 (Dckt. No. 103-2, at 34 of 598) ("The machine is not supposed to be used on a ramp. And so – it's not supposed to be used outdoors and the manual clearly says that. It's an indoor machine on level surface. The manual says that. And it says don't use it on a ramp."); Pl.'s Statement of Facts, at ¶¶ 28, 34–36 (Dckt. No. 107) (contending that Ferrone rested his suitability opinions on the slope of the ramp, and on the use of the walkie outside).

Those opinions are rife with problems. For starters, the Federal Rules require that a report "must contain" a "complete statement" of "all opinions" that an expert will offer, as well as the "basis and reasons for them." *See* Fed. R. Civ. P. 26(a)(2)(B)(i); *see also* 11/2/2020 Order (Dckt. No. 70) (setting a deadline for expert disclosures).

The disclosure rules exist for good reason. They keep experts in check, facilitate trial preparation, and prevent sandbagging and unfair surprise. Experts can't pass through the gate if they are busy sandbagging their opponents with new, undisclosed opinions. Rule 26 is like customs – to pass through, you have to declare anything important in advance.

There is nothing in Ferrone's report about the ramp, or about using the machine outside. He did not disclose any such opinions in the report, so they are out of bounds. It is too late to disclose them orally, after the fact. An expert must disclose opinions in a written report, not on the fly at deposition. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring an expert to disclose "all opinions" in a "*written* report") (emphasis added).

The solitary reference to suitability in the conclusion page of the report is not a foothold to support undisclosed opinions. Again, the Federal Rules require a "complete statement" of "all opinions," and the "basis and reasons for them." *See* Fed. R. Civ. P. 26(a)(2)(B)(i). The Federal Rules contemplate full disclosure, and it is not enough to sprinkle an expert report with a few buzzwords.

52

The report offered no reason to think that the machine was unsuitable, other than the expert's say-so. Again, Ferrone has offered no analysis. He did not analyze how using the machine on an incline, or using the machine outside, may have affected its performance, if at all. Maybe it affected the performance of the machine, or maybe not. We'll never know, because Ferrone doesn't know, because he never looked into it.

Maybe Plaintiff simply wants Ferrone to testify about the content of the walkie's manual. That is, maybe the goal is simply to get Ferrone to say that the manual prohibits using the machine on an incline, or outside. That wouldn't matter, either. Ferrone would not assist the jury by simply reading what the manual says. *See* Fed. R. Evid. 702. And reading the manuals is not "specialized knowledge," either. *Id.*

Ferrone's opinions about the suitability of the walkie do not satisfy the reliability standards of the Federal Rules. The Court grants the *Daubert* motion and excludes the testimony that the walkie was unsuitable.

### 3.    The Upshot

Ferrone cannot testify that the walkie was unsafe or unsuitable. Strictly speaking, maybe Ferrone could testify about the tests themselves – meaning the measurements that he took – without including the conclusion that the machine was unsafe. Sherwin-Williams did not argue that the methodology for the measurements lacked reliability.

Still, raw measurements would not "help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702. Telling the jury that the machine sometimes stops in 60–64 inches won't give them much help. They won't know if that stopping distance is good or bad without something to compare it to.

Also, there is nothing in the record suggesting that that stopping distance proximately caused the injury. "Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).

In sum, the Court concludes that Ferrone's opinions do not satisfy the reliability standards of *Daubert* and the Federal Rules. The *Daubert* motion is granted.

### C.    The Motion for Summary Judgment

The Court ends where it started. Burns needed expert testimony to satisfy his burden of proof. Without expert testimony, Burns has no evidence that the walkie was unsafe and unsuitable, and has no evidence that problems with the walkie proximately caused his injuries. Burns has no evidence to support essential elements of his claim, so it cannot go forward.

### Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment, and grants its motion to exclude Plaintiff's expert under *Daubert*.

Date:    September 18, 2022

_____

Steven C. Seeger
United States District Judge

54